# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 23-cv-60654-BLOOM/Valle

PROGRESSIVE EXPRESS
INSURANCE COMPANY,

     Plaintiff,

v.

RASIER (FL), LLC,
UBER TECHNOLOGIES, INC.,
CHRISTOPHER BERNADEL, and
APRIL N. MCGLASHAN, as Personal Representative
of the Estate of Miles McGlashan, Deceased

     Defendants.

_____/

## OMNIBUS ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION FOR PARTIAL SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon two separate Motions. (1) Defendant Christopher Bernadel ("Bernadel") filed a Motion for Judgment on the Pleadings, ECF No. [42]; Plaintiff Progressive Express Insurance Company ("Progressive") filed a Response in Opposition, ECF No. [44], to which Bernadel filed a Reply, ECF No. [45]. (2) Progressive filed a Motion for Partial Summary Judgment, ECF No. [48] ("Motion for Summary Judgment"); Bernadel filed a Response in Opposition, ECF No. [49], as did Defendant April N. McGlashan ("McGlashan"), ECF No. [50]. Progressive filed a Reply to Bernadel's Response, ECF No. [52], and to McGlashan's Response, ECF No. [53]. The Court has carefully reviewed the Motions, all opposing and supporting submissions,[1] the record in this case, the applicable law, and is otherwise fully advised.

---

[1] Progressive filed a Statement of Material Facts, ECF No. [48-2] ("SMF"), with its Motion for Summary Judgment. Bernadel and McGlashan each filed Statements of Material Facts in Opposition to Defendant's Motion for Summary Judgment and Statements of Additional Material Facts with their Responses. The Court refers to Bernadel and McGlashan's Statements, and Progressive's Replies to each,

For the reasons set forth below, Bernadel's Motion for Judgment on the Pleadings is denied and

Progressive's Motion for Summary Judgment is granted.

## I.  BACKGROUND

Progressive seeks a declaratory judgment that its automobile liability policies do not

provide insurance coverage for a shooting incident at issue in a lawsuit brought by McGlashan in

the Seventeenth Judicial Circuit in and for Broward County, Florida, styled *April N. McGlashan,*

*as personal representative of the Estate of Miles McGlashan, Plaintiff, v. Christopher Bernadel,*

*et. al.*, Case No. CACE-23-003146 ("Wrongful Death Action"), and that Progressive thus has no

duty to defend or indemnify Defendants Uber Technologies, Inc. ("Uber"), Rasier (FL), LLC

("Rasier"), Bernadel and McGlashan (collectively, "Defendants") in that proceeding.[2] Progressive

initiated this action on April 6, 2023, and thereafter filed its Amended Complaint, ECF No. [30],

alleging four claims for declaratory relief.

The Amended Complaint alleges Progressive issued two automobile liability policies to

Rasier—Uber's wholly-owned subsidiary—in March 2022, with Uber listed as a named insured.

*Id.* ¶¶ 16, 25. Both policies provide automobile liability coverage pursuant to Florida's

Transportation Network Company Statute, Fla. Stat. § 627.748 ("TNC Statute"), which requires

ride-share companies such as Uber and Rasier to provide automobile liability coverage for Uber

drivers while conducting Uber rides, or while available to receive requests for such rides. *See*

---

as follows: Bernadel's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment and Statement of Additional Material Facts, ECF No. [49-1] ("BSAMF"); McGlashan's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment and Statement of Additional Material Facts, ECF No. [51] ("MSAMF"); Progressive's Reply Statement of Material Facts and Response to Statement of Additional Facts to Bernadel, ECF No. [52-1], ("RBSAMF"); and Progressive's Reply Statement of Material Facts and Response to Statement of Additional Facts to McGlashan, ECF No. [53-1], ("RMSAMF").

[2] McGlashan brought the Wrongful Death Action in her capacity as the Personal Representative of the Estate of Decedent Miles McGlashan. *See generally* ECF No. [28-1].

*generally id.* Progressive alleges that on November 9, 2022, Bernadel accepted Decedent Miles McGlashan's ("Decedent") ride request on the Uber application. *Id.* ¶ 36. The two men got into a disagreement during this ride. *Id.* ¶ 39. That disagreement escalated, leading both men to engage in a verbal altercation outside of the vehicle. *Id.* ¶ 42. During that altercation, Bernadel drew a gun and shot Decedent. *Id.* ¶ 43. Decedent later died from the gunshot wound. *Id.* ¶ 44 ("Incident").

Count I seeks a declaratory judgment that Progressive has no duty to defend or indemnify because the Incident did not arise "out of the ownership, maintenance, or use of an insured auto"; Count II alternatively seeks declaratory relief that the Incident does not constitute an "accident" under either insurance policy; Count III alternatively seeks a declaratory judgment that the Incident is excluded from coverage—and thus any corresponding duty to defend or indemnify—under the policies' intentional act exclusions. Counts I – III also each seek a general declaration that the policies do not cover the Incident.

McGlashan's Second Amended Complaint in the Wrongful Death Action, ECF No. [28-1] ("State Court Complaint"), similarly alleges Bernadel shot and killed Decedent during an Uber ride on November 9, 2022. The State Court Complaint alleges battery and negligence claims against Bernadel and negligence claims against Uber and Rasier. The battery claim (Count I) alleges Bernadel "committed an intentional act of violence" against Decedent by shooting and killing him, a "brutal assault which caused his death." *Id.* ¶¶ 36-37. The negligence claim (Count II) alleges Bernadel breached his duty "to act reasonably around passengers and customers . . . by shooting" Decedent. *Id.* ¶¶ 41-42. The negligence claims against Uber (Count III) and Rasier (Count IV) allege Uber and Rasier breached the duty of reasonable care owed to Decedent by allowing Bernadel "to operate as a driver-partner, fail[ing] to 'deactivate' Defendant Bernadel as a driver-partner or deny access to his driver account[.]" *Id.* ¶¶ 52, 63. The State Court Complaint

alleges "as a direct and proximate result" of Uber and Rasier's "negligent selection or retention" of Bernadel, Decedent "suffered great bodily harm on November 9, 2022, which caused his death." *Id.* ¶¶ 54, 65.

On November 6, 2023, Bernadel filed his Motion for Judgment on the Pleadings. Bernadel contends the Amended Complaint demonstrates he is entitled to judgment because the allegations demonstrate (1) there is no case or controversy, or any such controversy is unripe for adjudication; (2) Progressive lacks standing to bring this action for declaratory relief; and (3) the pleadings demonstrate Progressive has a duty to defend him in the Wrongful Death Action. Progressive responds that a ripe controversy exists between the parties, it has standing to bring this action, and its pleadings fail to demonstrate it has a duty to defend Bernadel.

Progressive filed its Motion for Summary Judgment on February 14, 2024.[3] Progressive argues the undisputed material facts establish its automobile liability policies do not apply to the Incident, and it therefore has no duty to defend or duty to indemnify Defendants in the Wrongful Death Action. Progressive points out that the Incident was a shooting, not a car accident. Moreover, Progressive contends Bernadel's deposition testimony establishes he intentionally shot and killed Decedent, which demonstrates it has no duty to defend or indemnify Defendants in the Wrongful Death Action. Bernadel responds that Progressive has a duty to defend him in the Wrongful Death Action because the Incident *did* arise from the use of an insured automobile. Bernadel also argues that the questions of whether the Incident constitutes an accident under the policies and whether the intentional act exclusions apply constitute genuine disputes of material fact. McGlashan responds that the policies' severability clauses demonstrate Progressive has a duty to defend

---

[3] Progressive styles its Motion for Summary Judgment as one for partial judgment because it seeks judgment on Counts I – III only. As Progressive observes, however, declaratory judgment as to Counts I – III moots Count IV.

Defendants in the Wrongful Death Action even if Bernadel intentionally shot Decedent.[4]

### A. MATERIAL FACTS

Based on the Parties' briefings and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

### i. The Policies

Rasier and Uber provide services that subject them to the requirements of Florida's TNC Statute as "transportation network companies." SMF ¶ 1; BSAMF ¶ 1; MSAMF ¶ 1. Progressive issued Rasier two automobile liability policies on March 1, 2022, with Uber listed as a named insured: Policy No. 06250133, ECF No. [1-1] ("Period 1 Policy"), and Policy No. 06250110, ECF No. [1-2] ("Period 2-3 Policy"). SMF ¶ 2; BSAMF ¶ 2; MSAMF ¶ 2. Pursuant to § 627.748 of the TNC Statute, the policies provide coverage for Uber drivers in two scenarios. The Period 1 Policy provides liability coverage while Uber drivers are "available to receive service requests." ECF No. [1-1] at 5.[5] The Period 2-3 Policy provides liability coverage "during a prearranged service." ECF No. [1-2] at 5.

The Period 1 Policy generally provides the following automobile liability coverage:

**PART I—LIABILITY TO OTHERS**

**INSURING AGREEMENT—LIABILITY TO OTHERS**

Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the **insured auto** involved, **we** will pay damages, other than punitive or exemplary dam- ages, for **bodily injury** and **property damage** for which an **insured** becomes legally responsible because of an **accident** that occurs within the state of Florida arising out of the ownership, maintenance or use of an **insured auto** while **available to receive service requests**.

---

[4] Uber and Rasier did not respond to Progressive's Motion for Summary Judgment. However, they filed an Answer to the Amended Complaint, ECF No. [31], which admits Progressive has no duty to defend or indemnify them as to Counts I – III. *See id.* ¶¶ 60, 73, 86.

[5] The Policies do not include the pagination generated by the electronic CM/ECF database. For clarity, the Court instead cites to the page numbers contained within the Policies.

ECF No. [1-1] at 5. The Period 2-3 Policy provides similar coverage:

**PART I—LIABILITY TO OTHERS**

**INSURING AGREEMENT—LIABILITY TO OTHERS**

> Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the **insured auto** involved, **we** will pay damages, other than punitive or exemplary dam- ages, for **bodily injury** and **property damage** for which an **insured** becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of an **insured auto** during a **prearranged service**.

ECF No. [1-2] at 5. The Period 1 Policy defines "insured auto" in pertinent part as:

> a. Any **auto** while being used by a **TNC driver**, but only while **available to receive service requests** utilizing the **ride-share application** accessed using that **TNC driver's valid credentials**; or . . .

ECF No. [1-1] at 3. The Period 2-3 Policy similarly defines "insured auto" in pertinent part

as:

> a. Any **auto** while being used by a **TNC driver**, but only while engaged in providing a **prearranged service** utilizing the **ride-share application** accessed using that **TNC driver's valid credentials**; or . . .

ECF No. [1-2] at 3. Relevant here, both the Period 1 Policy and Period 2-3 Policy (collectively,

the "Policies") define "accident" as "a sudden, unexpected and unintended event that causes **bodily**

**injury** or **property damage**." ECF No. [1-1] at 2; ECF No. [1-2] at 2. The Policies contain an

identical Intentional Act Exclusion, which provides:

> Coverage under this Part I, including **our** duty to defend, does not apply to:
>
> 1. **Expected or Intended Injury**
>    **Bodily injury** or **property damage** either expected by, or caused intentionally by, or at the direction of, the **insured**.

ECF Nos. [1-1] at 6, [1-2] at 7. The Policies also both contain an identical Severability Clause,

which provides the following:

**Severability**

Apart from certain exceptions for the Limit of Liability as described in this policy, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or lawsuit is brought.

ECF No. [1-1] at 20; ECF No. [1-2] at 23.

### ii. The Incident

On November 9, 2022, Bernadel logged into the Uber ride-sharing application. SMF ¶ 12; BSAMF ¶ 12; MSAMF ¶ 12. Decedent requested a ride through the Uber ride-sharing application later that night, which Bernadel subsequently accepted. SMF ¶¶ 13-14; BSAMF ¶¶ 13-14; MSAMF ¶¶ 13-14. Bernadel picked up Decedent and proceeded to drive him to "a location at or near the intersection of North Park Road and Oak Drive in Hollywood, Florida." SMF ¶ 16; BSAMF ¶ 16; MSAMF ¶ 16.

A dispute thereafter arose between Bernadel and Decedent, which led to Bernadel shooting Decedent. SMF ¶¶ 17-23; BSAMF ¶¶ 17-23; MSAMF ¶¶ 17-23. It is disputed whether Bernadel qualified as an insured under the Policies during this period. MSAMF ¶ 39; RMSAMF ¶ 39. Bernadel testified that the dispute concerned whether Bernadel brought Decedent to the wrong destination, and how much Decedent should pay Bernadel to drive him to the correct destination. ECF No. [48-3] at 37-38. Bernadel also testified that the verbal altercation escalated, prompting both men to exit the vehicle. *Id.* at 44-45. Bernadel exited with his gun in his "appendix-mounted holster." *Id.* at 45. Decedent then struck Bernadel several times in the head. *Id.* at 46. Bernadel testified that he unholstered his gun, while being struck by Decedent, and shot him. *Id.* at 48-49. Bernadel testified that he intentionally shot Decedent:

Q: When you pulled the trigger to defend yourself, you intended to shoot Mr. McGlashan, correct?

A: To defend myself.

Q: So I was right, correct?

A: To defend myself, yes.

. . .

Q: Did you pull the trigger intending that the bullet you fired would hit Mr. McGlashan?

A: Correct.

ECF No. [48-3] at 50, 52.

### iii. The Wrongful Death Action

On December 7, 2022, attorneys representing the Estate of Miles McGlashan requested that Progressive provide information concerning the existence and amounts of available insurance coverage. SMF ¶ 26; BSAMF ¶ 26; MSAMF ¶ 26. McGlashan thereafter filed the Wrongful Death Action on March 9, 2023 in the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. CACE-23-003146, in connection with the Incident. SMF ¶ 27; BSAMF ¶ 27; MSAMF ¶ 27.

The Wrongful Death Action's Complaint, ECF No. [28-1], alleges four claims: Count I alleges a battery claim against Bernadel; Count II alleges a negligence claim against Bernadel; Count III alleges a negligence claim against Uber; and Count IV alleges a negligence claim against Rasier. SMF ¶ 28; BSAMF ¶ 28; MSAMF ¶ 28. The Second Amended Complaint alleges the "disagreement" between Bernadel and Decedent began "[a]t some point during the ride[.]" ECF No. [28-1] ¶ 30. It further alleges that "[i]n response, Defendant Bernadel, grabbed a concealed gun from his car and killed Miles McGlashan by shooting him in the back. The bullet fired by Defendant Bernadel, pierced Miles McGlashan's right lung, kidney, and liver." *Id.* ¶ 31.

## II.  LEGAL STANDARD

### A.  Judgment on the Pleadings

"After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001); see also *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014); *Palmer & Cay, Inc. v. Marsh & McLennan Cos.*, 404 F.3d 1297, 1303 (11th Cir. 2005); *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1291 (11th Cir. 2002). "A motion for judgment on the pleadings admits the [non-moving party's] factual allegations and impels the district court to reach a legal conclusion based on those facts." *Gachette v. Axis Surplus Ins. Co.*, No. 19-23680-CIV, 2020 WL 2850587, at *1 (S.D. Fla. Apr. 1, 2020) (quoting *Dozier v. Prof'l Found. for Heath Care, Inc.*, 944 F.2d 814, 816 (11th Cir. 1991)). "In determining whether a party is entitled to judgment on the pleadings, [courts] accept as true all material facts alleged in the non-moving party's pleading, and [] view those facts in the light most favorable to the non-moving party." *Perez*, 774 F.3d at 1335 (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). "A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *King v. Akima Glob. Servs.*, LLC, 775 F. App'x 617, 620 (11th Cir. 2019).

### B.  Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and

'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations[.]" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also Crocker v. Beatty,* 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990) (citation omitted).

### C. Declaratory Judgment Act

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Am. Ins. Co. v. Evercare Co.*, 430

F. App'x 795, 798 (11th Cir. 2011) (quoting *GTE Directories Pub. Corp. v. Trimen Am., Inc.*, 67 F.3d 1563, 1567 (11th Cir. 1995)); *see also Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002) (judgment on the pleadings is warranted "when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts.").

## III. DISCUSSION

### A. Judgment on the Pleadings

Bernadel contends he is entitled to judgment on the pleadings because Progressive's Amended Complaint establishes no actual controversy exists between the parties, or that any such controversy is unripe for judicial resolution. Bernadel also argues Progressive lacks standing to bring this action because it has not suffered an injury in fact. On the merits, Bernadel argues the Amended Complaint alleges doubt regarding whether the Policy covers the Incident, and that this doubt demonstrates Progressive has a duty to defend him in the Wrongful Death Action. Progressive responds that there is an actual controversy between the parties, it has standing to bring the instant action, and Progressive's pleadings fail to demonstrate it has a duty to defend Bernadel.

As a threshold matter, Bernadel is incorrect that this Court lacks subject-matter jurisdiction over this action. Bernadel relies on *Household Bank v. JFS Grp.*, 320 F.3d 1249 (11th Cir. 2003) that "a federal district court has subject-matter jurisdiction over a declaratory judgment action if . . . a plaintiff's well-pleaded complaint alleges facts demonstrating the defendant could file a coercive action arising under federal law." *Id.* at 1259. Bernadel contends no subject-matter jurisdiction exists here due to the absence of any underlying federal question jurisdiction. The Court disagrees. *Household Bank* addressed the propriety of affording declaratory relief when federal question jurisdiction was the sole basis for subject-matter jurisdiction. Moreover, it observed diversity jurisdiction provided an appropriate jurisdictional basis for affording declaratory relief. *See id.* at 1256 (noting the Supreme Court held in *Skelly Oil Co. v. Phillips*

*Petroleum Co.*, 339 U.S. 667, 675-78 (1950) that the district court "had original jurisdiction" over an action for declaratory relief "based on diversity jurisdiction.").

Unlike the plaintiff in *Household Bank*, Progressive's allegations demonstrate this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1)—an assertion Bernadel does not dispute. Progressive is a corporation organized under the laws of Ohio with its principal place of business located in Mayfield Village, Cuyahoga County, Ohio. ECF No. [30] ¶ 1. Rasier is a foreign limited liability company and wholly owned subsidiary of Uber organized under the laws of Delaware and with its principal place of business located in San Francisco, San Francisco County, California. *Id.* ¶ 2. Uber is also a foreign limited liability company organized under the laws of Delaware and with its principal place of business located in San Francisco, San Francisco County, California. *Id.* Bernadel and McGlashan are residents and citizens of Broward County, Florida. *Id.* ¶¶ 4-6.

The amount in controversy requirement is also satisfied. It is presently unclear whether the Incident occurred during a prearranged ride. However, the State Court Complaint alleges the dispute leading to the Incident began "[a]t some point during the ride[.]" ECF No. [28-1] ¶ 30. The Period 2-3 Policy provides for up to $1,000,000.00 in liability coverage for death, bodily injury, and property damage for losses occurring during a prearranged ride pursuant to the TNC Statute's requirements. ECF No. [1-2] at 3. Taking the State Court Complaint's allegations as true, Progressive accordingly risks up to $1,000,000.00 in liability exposure in the event it has a duty to indemnify Defendants in the Wrongful Death Action. *Household Bank* accordingly provides no basis for finding a lack of subject-matter jurisdiction here.

### i.   Ripeness

Bernadel also argues that because the underlying Wrongful Death Action is unresolved,

there is no actual controversy between the parties. According to Bernadel, it is unclear whether Progressive's Policies will be implicated by the Wrongful Death Action. As such, a declaratory judgment regarding Progressive's obligations under the Policies is premature. Bernadel cites *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348 (M.D. Fla. 2001) for support. In *Northland*, the plaintiff-insurer brought a declaratory judgment action that it had no obligation to defend or indemnify the defendant-insured in five underlying state court actions. *Id.* at 1352. The parties both moved for summary judgment on whether the plaintiff-insurer was obligated to cover any of the five state court actions. The court found that declaratory relief was appropriate with respect to two of the five actions. *Id.* at 1365. Declaratory relief was inappropriate with respect to the remaining three actions, however, as the defendant-insurer's duty to indemnify was contingent on adjudicating unresolved facts. *Id.* at 1363.

Bernadel relies on *Northland's* observation that "[b]ecause an insurer's duty to indemnify is dependent on the outcome of a case, any declaration as to the duty to indemnify is premature unless there has been a resolution of the underlying claim." *Northland*, 160 F. Supp. at 1360 (collecting cases). Bernadel argues this statement demonstrates declaratory relief is premature because the Wrongful Death Action has not been resolved, making Progressive's duty to defend or indemnify unclear. As Progressive correctly observes, however, *Northland* did not determine that declaratory relief is *never* appropriate before an underlying claim is resolved. To the contrary, *Northland* explicitly noted it could declare a party's duty to indemnify regarding an unresolved claim "if the court can determine that the allegations in the complaint could under no circumstances lead to a result which would trigger the duty to indemnify." *Id.* (citations omitted). The court found such situations enable it to "adequately assess the duty to indemnify *prior to a conclusion on the merits of the underlying litigation*." *Id.* The court thereafter entered summary judgment in favor of

the plaintiff-insurer on two of the five pending actions despite the fact the underlying claims were

unresolved. *Id.* at 1365. Bernadel's reliance on *Northland* is therefore misplaced.

Progressive responds that the Eleventh Circuit has made clear there is a ripe controversy

between the parties where, as here, an insured is sued in tort for conduct that may implicate a

insurer's duty to defend or indemnify under an applicable insurance policy. The Eleventh Circuit

recently explained such situations are particularly amenable to declaratory relief:

> Declaratory actions are especially helpful for third parties—insurance companies
> in particular. *See, e.g.*, *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265,
> 1267 (11th Cir. 2014); *Ameritas*, 411 F.3d at 1329–30; *Admiral Ins. Co. v. Feit
> Mgmt. Co.*, 321 F.3d 1326, 1327 (11th Cir. 2003). That is because a tort suit against
> an insured often generates distinct issues beyond whether the insured is liable for
> the tort, say, whether the insurer has a duty to defend, or whether the insured's
> policy covers the liability alleged in the complaint. *See Maryland Cas. Co. v. Pac.
> Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *Advanced
> Sys., Inc. v. Gotham Ins. Co.*, 272 So. 3d 523, 527 (Fla. Dist. Ct. App. 2019) (an
> insurer's duty to defend "is not determined by the insured's actual liability"). When
> the policy does not cover the liability even if all the facts alleged in the complaint
> are true, declaratory relief enables the insurance company to avoid the tort suit
> completely. *Cf. National Trust Ins. Co. v. S. Heating & Cooling, Inc.*, 12 F.4th
> 1278, 1290 (11th Cir. 2021). And even when the policy does apply, a declaratory
> suit allows the insurance company to resolve its liability without waiting for every
> individual injured party to sue the insured. Declaratory judgments thus play a
> valuable role in this context, clarifying insurance companies' liability quickly and
> directly.

*James River Ins. Co. v. Rich Bon Corp.*, 34 F.4th 1054, 1058 (11th Cir. 2022).

The instant action is a paradigmatic example of a viable third-party declaratory relief

action: an insurer, Progressive, seeks a declaration that it has no duty to defend or to indemnify

Defendants in the Wrongful Death Action because Defendants' conduct does not trigger coverage

under the Policies. Declaratory relief will either allow Progressive "to avoid the tort suit

completely[,]" or "to resolve its liability without waiting for every individual injured party to sue

the insured." *Id.* Bernadel does not contend that the Policies—and therefore Progressive's

obligations—are not implicated by the Wrongful Death Action. Nor could he, as Progressive's

pleadings make clear the Policy is implicated by the Wrongful Death Action, as does Bernadel's argument that Progressive has a duty to defend him in that action. In short, the Amended Complaint, the State Court Complaint, and Bernadel's own position "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Evercare Co.*, 430 F. App'x 795 at 798. The Court therefore concludes that a substantial controversy exists between the parties that is ripe for declaratory relief.

### ii. Standing

Bernadel next argues Progressive lacks standing to bring this action because it has not suffered an injury in fact. Bernadel contends that because the Wrongful Death Action remains pending, Progressive has suffered no actual injury, and any future injury remains hypothetical. Progressive responds that its allegations demonstrate an actual controversy exists between the parties such that it has standing to seek declaratory relief.

As Progressive correctly observes, "a party has standing to bring an action under the Declaratory Judgment Act if an actual controversy exists, which is the same as an Article III case or controversy." *Arris Group, Inc. v. British telecoms. PLC*, 639 F.3d 1368, 1373 (11th Cir. 2011). If an actual controversy exists, the court "may declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a); *see Davis v. Fed. Electio Com'n*, 554 U.S. 724, 734 (2008) ("[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct.") (citations omitted)). Moreover, the Eleventh Circuit has found there is "sufficient controversy between the insurer and the injured person that a declaratory judgment action is permissible[]" where "a liability insurer seeks a declaration that it will not be liable to indemnify

an insured person for any damages the injured person may recover[.]" *GTE Directories Pub. Corp. v. Trimen Am., Inc.*, 67 F.3d 1563, 1569 (11th Cir. 1995) (quoting 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE, § 2757, at 586 (2d ed. 1983) (internal quotation marks omitted)).

Bernadel's position that an actual injury must be suffered before a party is afforded declaratory relief is accordingly foreclosed by binding precedent. As discussed, the Court finds an actual controversy exists between the parties. Declaring the respective rights and legal obligations of the parties is therefore appropriate even though the injury is not yet actualized. *Davis*, 554 U.S. at 734 (citations omitted). The Wrongful Death Action makes clear Progressive's prospective injury—liability exposure for failing to defend or indemnify Bernadel, Uber, or Raiser in the Wrongful Death Action—is "real, immediate, and direct." *Id.* Progressive thus has standing to bring this action.

### iii.  Duty to Defend

Bernadel argues he is entitled to judgment on the pleadings because the Complaint demonstrates Progressive has a duty to defend him in the Wrongful Death Action. For support, Bernadel asks the Court to take judicial notice of the Wrongful Death Action, specifically that the State Court Complaint alleges battery and negligence claims against Bernadel (Counts I – II), and negligence claims against Uber (Count III) and Rasier (Count IV). Bernadel argues the negligence claims are covered under the Policies even if the battery claim is not, thus triggering Progressive's duty to defend. Bernadel also argues Progressive's allegation expressing uncertainty regarding its coverage obligations demonstrates Progressive has a duty to defend him as a matter of law. Progressive responds that the fact that the Wrongful Death Action features negligence claims fails to demonstrate it has a duty to defend Bernadel in that action, and that it has no such duty because

the Policies do not cover the Incident.

Bernadel's arguments in support of judgment on the pleadings misconstrue established law. Although Bernadel is correct that "even when the allegations in the complaint are partially within and partially outside the coverage of the policy, the insurer is obligated to defend the entire suit[,]" he has failed to show *any* of the claims at issue in the Wrongful Death Action are within coverage. *Jones, Foster, Johnston & Stubbs, PA v. ProSight-Syndicate 1110 at Lloyd's*, 680 F. App'x 793, 797 (11th Cir. 2017). Bernadel simply asserts that the negligence claims are covered under the Policy even if the battery claim is not. As Progressive points out, however, Bernadel has the burden to demonstrate those claims are covered under the Policy. *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997). Bernadel provides no support for his position that the nature of the claim determines whether the underlying incident is covered under the Policies. Bernadel has also failed to show the plain language of the Policies apply to the Incident and therefore cover the claims in the Wrongful Death Action. Moreover, in his Reply, Bernadel effectively concedes doing so is impossible. *See* ECF No. [45] at 3 ("The problem here is that Bernadel cannot establish that the claims fall within coverage until resolution of the underlying wrongful death case brings those matters within scope of coverage under the insurance policy.") (citation omitted)). Accordingly, while Bernadel is correct that Progressive must defend the entire Wrongful Death Action if any claims trigger its duty to defend, he has failed to show precisely that—the existence of any claims triggering such an obligation.

Bernadel's reliance on Progressive's allegations fares no better. Bernadel emphasizes Progressive's allegation that it "is in doubt with respect to its rights, duties and obligations under the Period 1 Policy and the Period 2-3 Policy[,]" ECF No. [30] ¶ 66, and contends that this demonstrates the Policies are ambiguous as a matter of law. For support, Bernadel accurately

observes that "[a]ny doubt about the duty to defend must be resolved in favor of the insured." *Depositors Ins. Co. v. WTA Tour, Inc.*, 576 F. Supp. 3d 1066, 1073 (M.D. Fla. 2021). Although it is true that doubts regarding the duty to defend are resolved in favor of the insured, Bernadel's observation that Progressive expressed "doubt" as to its duty to defend in its Amended Complaint, without more, fails to show Progressive has a duty to defend as a matter of law. Entertaining such an argument ignores the Eleventh Circuit's guidance that "[u]nder Florida law, an insurance provider's duty to defend an insured party 'depends *solely* on the facts and legal theories alleged in the pleadings and claims against the insured.'" *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1323 (11th Cir. 2014) (quoting *James River Ins. Co. v. Ground Down Engineering, Inc.,* 540 F.3d 1270, 1275 (11th Cir. 2008) (emphasis in original)).

Progressive's allegation expressing uncertainty regarding its coverage obligations is not an allegation made against Bernadel or any other insured. As such, Progressive's expression of doubt regarding its duty to defend in the context of seeking declaratory relief cannot be used to demonstrate this duty is triggered by the Wrongful Death Action. It is true that Progressive "is obligated to defend a claim even if it is uncertain whether coverage exists under the policy." *Mid–Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.3d 1143, 1149 (11th Cir. 2010) (quoting *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.,* 695 So.2d 475, 476 (Fla. 3d DCA 1997)). However, Progressive chose to resolve its uncertainty by seeking a declaratory judgment that it has no such duty to defend. Doing so is consistent with the purpose of the Declaratory Judgment Act. *See, e.g.*, *James River Ins. Co.*, 34 F. 4th at 1058. Other than emphasizing Progressive's expression of doubt, Bernadel points to no other allegations—in this action or the Wrongful Death Action—which demonstrate Progressive has a duty to defend him in the Wrongful Death Action. And as noted, Bernadel effectively concedes he is unable to do so while the Wrongful Death Action

remains unresolved. Bernadel has accordingly failed to meet his burden to show that the pleadings entitle him to judgment on the pleadings.

The Court proceeds to consider whether Progressive has met its burden to show that it is entitled to summary judgment with respect to Counts I – III of the Amended Complaint.

### B.  Summary Judgment

"A federal court sitting in a diversity action applies state law using the choice of law rules of the forum state[.]" *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265 (11th Cir. 2014) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 135 F.3d 750, 752 (11th Cir. 1998)). Here, the Court must apply Florida law to interpret the Policies, as they present a question of contract interpretation under diversity jurisdiction. *Canal Indem. Co. v. Margaretville of NSB, Inc.*, 562 F. App'x 959, 961 (11th Cir. 2014); *Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.3d 1143 (11th Cir. 2010). Under Florida law, the interpretation of insurance policies is a matter of law reserved for the court. *Id.* An insurance policy should be given a construction that reflects the intent of the parties, *id.*, and policy provisions must be construed in accordance with the plain language of the policy. *Swire Pacific Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003). Ambiguous policy exclusions are construed against the drafter and in favor of the insured. *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000).

Progressive contends it is entitled to summary judgment on Counts I – III of its Amended Complaint because the undisputed evidence demonstrates it has no duty to defend or indemnify Defendants in the Wrongful Death Action. Progressive seeks a declaratory judgment that there is no policy coverage because (1) a shooting incident does not arise "out of the ownership, maintenance or use" of an insured automobile (Count I); (2) "Bernadel's act, of intentionally shooting McGlashan, was not an accident such that coverage is available under either policy"

(Count II); and (3) Bernadel's testimony that he intentionally shot McGlashan "triggers the Period 1 and Period 2-3 [Intentional Act] Exclusion such that there is no coverage under either Policy[]" (Count III). ECF No. [48] at 7. As noted above, Counts I – III also each seek a general declaration that the policies do not cover the Incident.

Bernadel responds that whether Progressive has a duty to defend him in the Wrongful Death Action is, at minimum, a genuine dispute of material fact. Bernadel contends the Incident *did* arise out of the ownership, maintenance, or use of an insured auto—his car—and that Bernadel shooting Decedent constitutes an accident, not an intentional act, because he lacked the requisite intent to harm Decedent. McGlashan responds that because the phrase "out of the ownership, maintenance or use" of an insured auto is ambiguous, this ambiguity must be construed as obligating Progressive to defend Defendants in the Wrongful Death Action. Alternatively, McGlashan argues her claims against Defendants clearly arose out of the use of an insured automobile. McGlashan also contends the Severability Clause contained in the Policies demands examining the Incident from each Defendant's perspective and the Incident constitutes an "accident" under the Policies because it was unexpected from the perspective of Uber and Rasier.

Progressive must show the undisputed evidence establishes it has no duty to defend or indemnify Defendants in the Wrongful Death Action. This showing "depends *solely* on the facts and legal theories alleged in the pleadings and claims" against Rasier, Uber, and Bernadel in the Wrongful Death Action. *James River Ins. Co. v. Ground Down Engineering, Inc.,* 540 F.3d 1270, 1275 (11th Cir. 2008) (emphasis in original). Because the pertinent language is identical in both Policies, the Court discusses the Policies together. The Court also analyzes Progressive's duty to defend and duty to indemnify together because "[i]f it is determined that [Progressive] has no duty to defend its insured(s), then there would be no corresponding duty to indemnify." *Infinity*

*Standard Ins. Co. v. Privett*, No. 8:12-CV-97-JDW-AEP, 2012 WL 13106398, at *1 (M.D. Fla. Feb. 24, 2012) (citations omitted). Conversely, if Progressive *does* have a duty to defend Defendants, "its indemnity obligations will be 'measured by the facts as they unfold at trial or are inherent in the settlement agreement.'" *Id.* (quoting *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1360 (M.D. Fla. 2001).

### i. Whether the Incident Constitutes an Accident "arising out of the ownership, maintenance, or use of an insured auto"

Progressive argues it is entitled to judgment on Count I because well-settled Florida law provides that shooting incidents like the Incident do not arise "out of the ownership, maintenance or use of an **insured auto**." ECF No. [1-1] at 5. Bernadel argues the cases on which Progressive relies do not apply outside the uninsured motorist context. McGlashan contends the Policies are ambiguous, therefore requiring Progressive to defend Rasier, Uber, and Bernadel as a matter of law. McGlashan also argues the cases on which Progressive relies are inapposite because none of them featured a severability clause. According to McGlashan, once viewed from the perspective of Rasier and Uber, the Incident clearly arose from the use of an insured automobile. As detailed above, both Policies require Progressive to "pay damages, other than punitive or exemplary damages, for **bodily injury** and **property damage** for which an insured becomes legally responsible because of an **accident** . . . arising out of the ownership, maintenance or use of an **insured auto**[.]" ECF Nos. [1-1] at 5, [1-2] at 5.

As Progressive accurately observes, "Florida courts have held that the critical language in the policies here at issue—'arising out of the ownership, maintenance, or use of an automobile'— is unambiguous." *Sunshine State Ins. Co. v. Jones*, 77 So. 3d 254, 257 (Fla. 4th DCA 2012) (collecting cases) (footnote call number omitted). Those courts "have consistently interpreted the language 'arising out of' to be 'words of much broader significance than "caused by" and have

been said to mean "originating from", "having its origin in", "growing out of" or "from", or in short, "incident to" or "having connection with" the use of the car.'" *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. Thomas,* 273 So.2d 117, 120 (Fla. 4th DCA 1973).

McGlashan nonetheless contends the language within the Policies is ambiguous because the Policies do not define the term "use", nor do they define the phrase "use of an insured auto". McGlashan argues those ambiguities demonstrate Progressive has a duty to defend Defendants. For support, McGlashan observes that "if there is more than one reasonable interpretation of an insurance policy, such ambiguities are construed against the insurer and in favor of coverage" and "[a]ll doubts as to whether a duty to defend exists in a particular case must be resolved against the insurer and in favor of the insured." *Integon Nat'l Ins. Co. v. Gregorio Multiservice, Inc.*, No. 13-cv-22936, 2014 WL 11906629, at *4, *7 (S.D. Fla. Sept. 2, 2014). While the Court certainly agrees ambiguities must be construed against Progressive, McGlashan has failed to show the language within the Policies is ambiguous. McGlashan asserts without support that the failure to define "use" or "use of an insured auto" demonstrates this policy language is ambiguous. But that argument ignores Florida courts routinely finding this *identical* language to be unambiguous. *See Sunshine State Ins. Co.*, 77 So. 3d at 257-58 (citing *Am. Sur. & Cas. Co. v. Lake Jackson Pizza, Inc.,* 788 So.2d 1096, 1099–1100 (Fla. 1st DCA 2001); *Alligator Enters., Inc. v. Gen. Agent's Ins. Co.,* 773 So.2d 94, 95 (Fla. 5th DCA 2000); *Hagen v. Aetna Cas. & Sur. Co.,* 675 So.2d 963, 966 (Fla. 5th DCA 1996) (*en banc*); *Cesarini v. Am. Druggist Ins. Co.,* 463 So.2d 451, 452 (Fla. 2d DCA 1985); *Indiana Ins. Co. v. Winston,* 377 So.2d 718, 719 (Fla. 4th DCA 1979); *Nat'l Indem. Co. v. Corbo,* 248 So.2d 238, 241 (Fla. 3d DCA 1971)).

Consistent with those authorities, the Court finds the critical language in the Policies at issue—"arising out of the ownership, maintenance, or use of an automobile"—is unambiguous.

The language refers to conduct "originating from", "having its origin in", "growing out of" or "from", or in short, "incident to" or "having connection with" the use of the car.'" *Sunshine State Ins. Co.*, 77 So. 3d at 257-58 (quoting *St. Paul Fire & Marine Ins. Co. v. Thomas,* 273 So. 2d 117, 120 (Fla. 4th DCA 1973)). To meet its burden, Progressive accordingly must show the undisputed evidence establishes the Incident did not originate from, grow out of, or have a connection with the use of the car.

Progressive primarily relies on the Florida Supreme Court's decision in *Race v. Nationwide Mut. Fire Ins. Co.*, 542 So. 2d 347 (Fla. 1989) and its progeny. In *Race*, the court considered "whether petitioners . . . may recover under the uninsured motorist ('UM') provision of their automobile insurance policy for injuries received from an uninsured motorist's intentional assault at the scene of a prior automobile accident." *Id.* at 347. The petitioner was rear-ended while stopped at a red light by an uninsured motorist. After exchanging information, the uninsured motorist stepped out of his car to request petitioner's identification. *Id.* When petitioner reached to grab his identification, the uninsured motorist thought petitioner was pulling a gun and struck petitioner multiple times, causing serious injuries. *Id.* The petitioner's insurer subsequently denied his uninsured motorist claim because petitioner's injuries "resulted from an intentional assault by a third person outside of the plaintiffs' motor vehicle and not as a result of the operation, maintenance or use of an uninsured motor vehicle." *Id.* at 348 (internal quotation marks omitted). Petitioner sued his insurer and appealed to the Florida Supreme Court after an appellate court reversed the trial court's finding that that incident *did* result from the operation or use of an uninsured motor vehicle. *Id.*

The Florida Supreme Court held "the term 'arising out of the ownership, maintenance, or use' of a motor vehicle as contained in a UM policy should be given the same interpretation as that

language is construed in automobile liability policies." *Id.* at 349. The court declined to adopt the more liberal causation standard it previously articulated in *Gov't Emps. Ins. Co. v. Novak*, 453 So. 2d 1116 (Fla. 1984) in the context of personal injury protection coverage, concluding "we are unwilling to apply the liberal PIP interpretation of nexus to claims for UM benefits." *Id.* at 349. Instead, the court adopted a three-factor test to determine whether a given incident arises out of the ownership, maintenance, or use of a motor vehicle: the accident (1) "must have arisen out of the inherent nature of the automobile, as such"; (2) "must have arisen within the natural territorial limits of an automobile, and the actual use, loading, or unloading must not have terminated"; and (3) "[t]he automobile must not merely contribute to cause the condition which produces the injury, but must, itself, produce the injury." *Id.* at 349 (citing 6B J. APPLEMAN, INSURANCE LAW AND PRACTICE, section 4317 (Buckley ed. 1979)).

Applying its three-factor test, the Florida Supreme Court held the incident in question did not arise from the ownership, use, or operation of an uninsured motor vehicle, explaining:

> In the instant case, a minor traffic accident was caused by the negligence of Thompson, the driver of the uninsured vehicle. No injury resulted from this accident. Both drivers then got out of their cars, surveyed the damages, and discussed whether or not the police should be called. At this point, the claimant, Race, reached into his bag to remove his insurance papers and identification. Believing that Race was about to pull out a gun, Thompson assaulted Race and caused the injuries for which the claims were made. The most that can be said is that the driving of the uninsured motorist which caused the accident created an atmosphere of hostility between the parties. It had nothing to do with Race's injuries, which only came about several minutes later when Thompson thought Race was reaching for a gun.
>
> Assuming the issue were liability coverage for Thompson and that Thompson's actions which caused the injury were negligent rather than intentional (thereby obviating any intentional act exclusion), no one could reasonably say that the act which caused the injury was covered under Thompson's *automobile* liability policy. The same analysis is applicable to uninsured motorist coverage because the accident must arise out of the use, maintenance, or operation of the uninsured motor vehicle.

*Id.* at 351.

Progressive argues *Race* makes clear the Incident does not arise from the use, maintenance, or operation of the uninsured motor vehicle. For support, it also notes both Florida and federal courts have applied the *Race* test and "consistently held that automobile policies do not afford coverage for shooting incidents, as the victim's injuries lack a sufficient causal relationship with the ownership, maintenance, or use of the insured vehicle." *Infinity Standard Ins. Co. v. Privett*, No. 8:12-CV-97-JDW-AEP, 2012 WL 12884405, at *2 (M.D. Fla. Oct. 29, 2012) (collecting cases).

Bernadel and McGlashan both argue *Race* and its progeny are distinguishable. Bernadel argues *Race* is inapposite because it concerns liability coverage under an uninsured motorist policy rather than an automobile liability policy. As detailed above, however, *Race* explicitly held this language "should be given the same interpretation *as that language is construed in automobile liability policies*." 542 So. 2d at 349 (emphasis added). Consistent with the Florida Supreme Court's guidance, courts have subsequently applied *Race* to automobile liability policies. *See, e.g.*, *Privett*, 2012 WL 12884405, at *2; *Fowler v. State Farm Mut. Auto. Ins. Co.*, 548 So. 2d 830, 832-33 (Fla. 1st DCA 1989). Bernadel's argument that the Court should instead apply the causation standard articulated in *Novak* is similarly foreclosed by *Race*. The Florida Supreme Court in *Race* explicitly declined to extend *Novak* to the uninsured motorist coverage, instead concluding that its three-factor test is the appropriate causation standard when interpreting either uninsured motorist or automobile liability policies. *Race*, 542 So. 2d at 349.

McGlashan argues *Race* and its progeny are distinguishable because none of those cases featured an automobile liability policy containing a severability clause. The Court is unpersuaded that the absence of severability clauses meaningfully distinguishes *Race* and its progeny.

25

McGlashan cites no support for her position that the absence of severability clauses in those cases renders the test articulated in *Race* inapplicable to the case at bar. McGlashan is correct the Policies' Severability Clause demands interpreting the Policies "as requiring that each insured has separate insurance coverage[]" such that "each insured must be treated independently from other insureds." *Evanston Ins. Co. v. Design Build Interamerican, Inc.*, 569 Fed. Appx. 739, 742-43 (11th Cir. 2014). However, such interpretation does not lead to a conclusion that the *Race* test is inapplicable. Instead, the Severability Clause simply requires applying the *Race* test to each insured to determine whether the insured's conduct arises out of the ownership, maintenance, or use of the insured auto. If it does, then Progressive has a duty to defend Defendants in the Wrongful Death Action. If it does not, then Progressive has no such duty. The Court proceeds to apply the *Race* three-factor test to determine whether the Incident arises out of the ownership, maintenance, or use of a motor vehicle: the accident (1) "must have arisen out of the inherent nature of the automobile, as such"; (2) "must have arisen within the natural territorial limits of an automobile, and the actual use, loading, or unloading must not have terminated"; and (3) "[t]he automobile must not merely contribute to cause the condition which produces the injury, but must, itself, produce the injury." *Race*, 542 So. 2d at 349.

### 1. Must Have Arisen Out of the Inherent Nature of the Automobile

The Incident—Bernadel shooting and killing Decedent—did not arise from the inherent nature of the automobile. Bernadel testified that the dispute leading to the Incident concerned payment for continuing the car ride and where its final destination should be. *See* ECF No. [48-3] at 37-38. Nothing about a dispute over payment and the correct destination arises out of the inherent nature of the Bernadel's automobile. Bernadel nonetheless argues the altercation began in his automobile, which demonstrates the dispute concerned and arose from the use, operation, and maintenance of his automobile. But the Incident's relationship to the actual use of Bernadel's

automobile is far too attenuated. Decedent and Bernadel's argument regarding payment in exchange for driving Decedent to a different destination did not arise out of the inherent nature of the automobile. It arose out of a dispute over how much Decedent should pay Bernadel to continue the ride.

McGlashan disputes whether the Incident arose from an argument over money. Other than alleging the "disagreement" between Bernadel and Decedent began "[a]t some point during the ride[,]" ECF No. [28-1] ¶ 30, the State Court Complaint is silent as to the nature of the disagreement. Whether Bernadel and Decedent argued over money fails to create a genuine dispute of material fact, however. Regardless of the nature of the dispute that arose between Bernadel and McGlashan, nothing about Bernadel's subsequent shooting and killing of Decedent arose from the inherent nature of his automobile.

As Progressive correctly points out, courts have found a shooting incident did not arise from the inherent nature of an automobile even when that automobile was instrumental in perpetrating the shooting. In *Privett*, for example, an employee drove his boss to a residence where the employee's boss previously saw his ex-girlfriend. 2012 WL 12884405, at *1. When the two men arrived, they saw the ex-girlfriend with another man. The employee's boss then exited the vehicle and shot that individual. *Id.* The district court applied the *Race* factors and concluded that the shooting incident did not arise from the "ownership, maintenance or use" of the insured automobile. *Id.*, at *4. Relevant here, the court found the shooting incident "had nothing to do with the inherent nature" of the automobile because it was simply a mode of transportation. The court in *Niglio v. Omaha Prop. & Cas. Ins. Co.*, 679 So. 2d 323 (Fla. 4th DCA 1996) similarly concluded that a drive-by shooting had nothing to do with the inherent nature of the insured automobile in question. *Id.* at 326. As in *Privett*, the court found the car was simply a mode of transportation,

and that the gun rather than the car itself caused the injury. *Id.*

As in *Privett* and *Niglio*, Bernadel's automobile was also simply a mode of transportation. Nothing about its inherent nature caused the Incident. Instead, an argument between Bernadel and McGlashan caused an altercation that culminated in Bernadel shooting Decedent. *See* ECF No. [48-3] at 37-38. Furthermore, the Wrongful Death Action alleges Bernadel's gun caused Decedent's death, not Bernadel's car. *See, e.g.*, ECF No. [28-1] ¶¶ 36-37, 43-44. Contrary to Bernadel's unsupported assertions, while the argument leading to Decedent's death began in the car, such fact does not establish the Incident concerned the inherent nature of an automobile.

McGlashan argues that even if the Incident does not arise out of the ownership, maintenance, or use of Bernadel's automobile, Uber and Rasier's conduct does. For support, McGlashan points out that her State Court Complaint alleges Uber and Rasier were negligent "in allowing a driver with a violent and reckless history to use his vehicle within their ride-share app[.]" ECF No. [50] at 7. McGlashan contends those allegations are "auto-based acts of negligence which are alleged to have proximately caused the injuries to the decedent[,]" and those allegations therefore demonstrate Uber and Rasier's conduct was "auto-based . . . not gun-based." *Id.* However, absent from that argument is any explanation of how Uber and Rasier's alleged conduct had anything to do with the inherent nature of an automobile. Negligently hiring a violent driver—or failing to prohibit that driver from using his vehicle to conduct Uber rides—is simply not conduct arising from the inherent nature of an automobile. That conduct instead concerns Uber and Rasier's actions or omissions in hiring Bernadel or failing to exercise reasonable care in investigating his background.

The Court concludes that the Incident did not arise from the inherent nature of Bernadel's automobile.

### 2.  Natural Territorial Limits and Actual Use of the Automobile

Regarding the second factor, it is disputed whether the Incident arose within the territorial limits of the automobile. As noted, Bernadel points out the argument leading to the Incident began inside the vehicle. McGlashan's State Court Complaint alleges the "disagreement" between Bernadel and Decedent began "[a]t some point during the ride[.]" ECF No. [28-1] ¶ 30. However, the State Court Complaint also alleges Bernadel "grabbed a concealed gun from his car and killed MILES MCGLASHAN by shooting him in the back." *Id.* ¶ 31. That allegation suggests the Incident took place outside the natural territorial limits of Bernadel's vehicle. Whether the Incident took place within the natural territorial limits fails to create a genuine dispute of material fact. Even assuming that Bernadel shot Decedent inside his car—an assumption which contradicts Bernadel's deposition testimony—the Court nonetheless finds the Incident fails to trigger Progressive's duty to defend under *Race's* three-factor test. This is because both the allegations and undisputed evidence demonstrate that the Incident neither arose from the inherent nature of the automobile nor was itself produced by Bernadel's automobile. The allegations and undisputed record evidence are fatal to Bernadel and McGlashan's arguments that the Incident *did* arise from the use of Bernadel's automobile.

### 3.  Incident Must Produce the Injury

Finally, the Bernadel's automobile plainly did not "itself[] produce the injury." *Race*, 542 So. 2d at 349. Instead, it "merely contribute[d] to cause the condition which produces the injury[.]" *Id.* Both Bernadel and McGlashan make much of the fact that the dispute which led to the Incident allegedly began in Bernadel's automobile. But this is not dispositive in light of *Race's* guidance that the automobile must itself *produce* the injury. As noted, it is undisputed that Bernadel's gun produced the injury here. Moreover, *Race* itself makes clear that the fact the use of an automobile "created an atmosphere of hostility between the parties[]" is insufficient. *Id.* at 351; *see also*

*Fowler v. State Farm Mut. Auto. Ins. Co.*, 548 So. 2d 830, 831 (Fla. 1st DCA 1989) (same). As
with the first two factors, McGlashan's allegations with respect to Uber and Rasier does not change
this conclusion. At best, Uber and Rasier's alleged negligence "merely contribute[d] to cause the
condition which produces the injury[.]" *Race*, 542 So. 2d at 349 (quotation omitted). As the State
Court Complaint makes clear, any negligence on the part of Uber and/or Rasier did not produce
Decedent's death. *See* ECF No. [28-1] ¶¶ 54, 65.

The Court concludes that Progressive has demonstrated that the undisputed evidence and
allegations in the Wrongful Death Action establish the Incident is not an accident "arising out of
the ownership, maintenance or use of an **insured auto**." ECF Nos. [1-1] at 5, [1-2] at 5. Progressive
is thus entitled to summary judgment with respect to Count I.

### ii.  Whether the Incident Constitutes an "Accident"

Progressive next argues it is entitled to judgment on Count II because Bernadel's deposition
testimony makes clear the Incident is not an "accident" as defined in the Policies. As noted above,
the Policies both define "accident" as "a sudden, unexpected and unintended event that causes
**bodily injury** or **property damage**." ECF Nos. [1-1] at 2, [1-2] at 2. Because Bernadel testified
that he intentionally shot Decedent with the intent to injure him, Progressive contends the Incident
is necessarily an intentional act, not an accident. Bernadel responds that whether Incident
constitutes an "accident" is a genuine dispute of material fact because it is unclear if Bernadel
possessed the requisite intent to harm Decedent when Bernadel shot him. McGlashan responds
that the Incident constitutes an "accident" because, from the perspective of Uber and Rasier, the
Incident was clearly a sudden, unexpected, and unintended event. McGlashan accordingly argues
the Incident constitutes an "accident" at least with respect to Uber and Rasier.

"Insurance policies are to be construed liberally in favor of the insured and strictly against

the insurer, and that whenever the language is susceptible of two or more constructions, the court

must adopt that which is most favorable to the insured[,]" *Grissom v. Commercial Union Ins. Co.*,

610 So. 2d 1299, 1304 (Fla. 1st DCA 1992). Florida courts have broadly interpreted the term

"accident" in the context of shooting incidents. In *Grissom*, for example, the court surveyed a line

of Florida cases discussing the extent to which an intentional act is properly understood as an

accident:

> The Florida courts in a line of cases have consistently held that insurance
> policies covering liability for an "accident" apply to any bodily injury or property
> damage inflicted by the insured on a third party where the insured does not intend
> to cause any harm to the third party; this result obtains even though damages are
> caused by the insured's intentional acts and were reasonably foreseeable by the
> insured. Insurance coverage has accordingly been found under such policies where
> an insured unintentionally shoots himself while playing "Russian Roulette," *Gulf
> Life Insurance Co. v. Nash,* 97 So.2d 4 (Fla. 1957); or unintentionally shoots
> himself while attempting to disarm a person in a fight in which the insured is the
> aggressor, *Harvey v. St. Paul Western Insurance Cos.,* 166 So.2d 822 (Fla. 3d
> D.C.A. 1964); or unintentionally shoots a bystander during a family quarrel,
> *Grange Mutual Casualty Co. v. Thomas,* 301 So.2d 158 (Fla. 2d D.C.A. 1974); or
> unintentionally hits a person in a crowd of people with a car while slowly driving
> into the edge of the crowd intending to disperse them, *Phoenix Ins. Co. v. Helton,*
> 298 So.2d 177 (Fla. 1st D.C.A. 1974), or unintentionally injures a person in a car
> while unintentionally pushing the car which was blocking a driveway, *Cloud v.
> Shelby Mutual Insurance Co.,* 248 So.2d 217 (Fla. 3d D.C.A. 1971). Running
> through all of these cases is an act of negligence by the insured, sometimes gross
> or even culpable negligence. But *never has coverage been found under such
> policies where the insured's act was deliberately designed to cause harm to the
> injured party*.

*Id.* at 1305 (quoting *Hartford Fire Ins. Co. v. Spreen,* 343 So. 2d 649, 650-51 (Fla. 3d DCA 1977)

(emphasis added)).

Accordingly, while a given incident may constitute an accident if the insured committed

an intentional act that caused *unintentional* harm to a third party, an incident is not an accident

"where the insured's act was deliberately designed to cause harm to the injured party." *Id.*

Although determining whether an incident constitutes an accident often demands a fact-intensive

inquiry to determine the insured's intent, Progressive contends such an inquiry is unnecessary here. Progressive relies on Bernadel's deposition testimony for support, which provides in pertinent part:

> Q: When you pulled the trigger to defend yourself, you intended to shoot Mr. McGlashan, correct?
>
> A: To defend myself.
>
> Q: So I was right, correct?
>
> A: To defend myself, yes.
>
> . . .
>
> Q: Did you pull the trigger intending that the bullet you fired would hit Mr. McGlashan?
>
> A: Correct.

ECF No. [48-3] at 49, 51. Progressive argues this testimony establishes Bernadel intentionally shot Decedent with the intention of injuring him, and that the Incident therefore cannot constitute an accident under the Policies.

Bernadel responds by arguing that whether he intentionally shot Decedent with the intent to harm him constitutes a genuine dispute of material fact. Bernadel contends that, although he intentionally shot Decedent with the intention of hitting him, he did not do so with the intent to harm him. For support, Bernadel attaches what he represents is a "sworn affidavit" attesting that Bernadel lacked the requisite criminal intent to harm Decedent.[6]

Bernadel's unsworn and unsigned statement fails to create a genuine dispute of material fact. Bernadel's argument that he lacked the intent to harm Decedent—despite testifying that he

---

[6] As Progressive observes, Bernadel's "sworn affidavit", ECF No. [49-5], is neither sworn nor signed.

intentionally shot him and intended to hit him—is a sham. It simply defies common sense to argue the act of intentionally firing a gun with the intention of striking another person with a bullet lacks the corresponding intent to harm that person. Progressive correctly observes Bernadel's "affidavit" violates the Eleventh Circuit's "sham affidavit rule." As the Eleventh Circuit explained in *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234 (11th Cir. 2003), "'when a party ha[s] given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, *without explanation*, previously given clear testimony' . . . . Such an affidavit would be a sham." *Id.* at 1240 n.7 (quoting *Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc.,* 736 F.2d 656, 657 (11th Cir.1984)). Here, the record reflects that Bernadel's sham affidavit attempts to create a genuine dispute of material fact with respect to his intent by contradicting his prior unambiguous and sworn deposition testimony. Other than noting that he disputes Progressive's characterization of his intent, Bernadel fails to explain why entertaining his "affidavit" is appropriate. The Court concludes that Bernadel's affidavit fails to create a genuine dispute of material fact with respect to his intent.

The Court agrees with Progressive that Bernadel's deposition testimony establishes the Incident was an intentional shooting. Because Bernadel intentionally shot Decedent, the Incident is necessarily not "a sudden, unexpected and unintended event that causes **bodily injury** or **property damage**." ECF Nos. [1-1] at 2, [1-2] at 2. That conclusion naturally follows from the plain language of the Policies and is consistent with well-settled Florida law. Moreover, that conclusion is in accord with the State Court Complaint's allegation that Bernadel "committed an intentional act of violence" against Decedent by "intentionally, knowingly, willfully, and maliciously sho[oting] and [killing]" Decedent. ECF No. [28-1] ¶ 36; *see also id.* ¶ 31 ("Defendant

Bernadel . . . grabbed a concealed gun from his car and killed Miles McGlashan by shooting him in the back. The bullet fired by Defendant Bernadel pierced Miles McGlashan's right lung, kidney, and liver.").

McGlashan again relies on the Policies' Severability Clause to argue that even if Bernadel intentionally shot and killed Decedent, Uber and Rasier did not. McGlashan accordingly argues the Incident constitutes an "accident" under the Policies because neither Uber nor Rasier expected or intended Bernadel would shoot and kill Decedent. The Court disagrees. First, Florida courts have consistently found an intentional act causing harm to a third party does not constitute an accident within the meaning of automobile liability policies. McGlashan points to no authority suggesting otherwise, nor does she articulate how the presence of a severability clause disturbs the conclusion that intentional acts are not accidents.

Second, McGlashan's interpretation of the Severability Clause is unreasonable. According to McGlashan, the Severability Clause requires examining *Bernadel's* conduct from the perspective of Uber and Rasier. Because neither Uber or Rasier expected Bernadel to shoot and kill Decedent, McGlashan contends the Incident constitutes an accident under the Policies because it was a sudden, unexpected and unintended event from the perspective of Uber and Rasier. But the fact that Uber and Rasier presumably did not expect *Bernadel* to intentionally shoot Decedent does not render the Incident an unintended event under the Policies. Stated differently, the fact that Uber and Rasier did not expect the Incident does not change the conclusion that the Incident itself was an intentional act causing injury, and therefore not an "accident" under the Policies. McGlashan provides no support for her position that the Severability Clause demands examining the conduct of one insured, Bernadel, from the perspective of other insureds, Uber and Rasier. The case she cites, *Tokio Marine Specialty Ins. Co. v. Ramos*, No. 19-22069-CIV, 2020 WL 6544626

(S.D. Fla. Nov. 6, 2020), does not support finding that an insured's intentional act causing bodily injury constitutes an accident simply because it was unexpected from another insured's perspective.

In *Tokio Marine*, a plaintiff-insurer sought declaratory relief that it had no duty to defend or indemnify a group of co-workers after an injured employee brought a lawsuit "for injuries he suffered as the result of a forklift accident[.]" 2020 WL 6544626, at *1. The injured employee alleged his co-workers were negligent in "improperly operat[ing] a forklift which caused a large item to fall and cause injury[,]" or by negligently supervising the "yard." *Id.*, at *1, *4. Relevant here, the plaintiff-insurer argued it had no duty to defend one of the defendant-employees because his conduct satisfied the applicable commercial liability policy's intentional act exclusion. *Id.*, at *6. The court noted the commercial liability policy included a severability clause, meaning the defendant-employee "would be excluded from coverage under the Policies if [the injured employee's] injury was 'expected or intended from the standpoint of'" that defendant-employee. *Id.*, at *6. This in turn required determining "if an insured's actions 'were so inherently dangerous' that it is 'virtually certain' that the conduct at issue would cause the injuries in question." *Id.* (quoting *Catlin Syndicate 2003 v. Rinkus*, 43 F. Supp. 3d 1255, 1260-61 (S.D. Fla. 2012)). The court concluded that the intentional act exclusion did not apply because the injured employee's allegations that the defendant-employee "acted with willful and wanton disregard, unprovoked physical aggression or with gross negligence towards [the injured employee]" failed to show the defendant-employee was virtually certain his conduct would cause the injured employee's injury. *Id.*

Mrs. McGlashan relies on *Tokio Marine* to argue the Incident constitutes an "accident" because Uber and Rasier were not virtually certain Bernadel's conduct would cause Decedent's

injuries. But *Tokio Marine* provides no support for interpreting the Severability Clause as requiring an analysis of one insured's conduct from another insured's perspective. To the contrary, *Tokio Marine* interpreted the severability clause at issue as requiring examining an insured's *own conduct* from that insured's perspective to determine whether the insured was virtually certain his conduct would cause the injury in question. *See id.*, at *6. Consistent with *Tokio Marine*, the Court does the same here.

Unlike *Tokio Marine*, neither Uber nor Rasier's alleged conduct caused the injury in question. *Tokio Marine* concerned the negligent acts of multiple co-workers culminating in a forklift accident injuring an employee. Here, the conduct at issue is Bernadel's intentional shooting of Decedent. As Progressive observes, the State Court Complaint makes clear that is the alleged conduct causing injury, not any negligence on behalf of Uber or Rasier. Count I alleges Bernadel "committed an intentional act of violence" against Decedent by shooting and killing him, a "brutal assault *which caused his death*." ECF No. [28-1] ¶¶ 36-37 (emphasis added). Counts III and IV respectively allege Uber and Rasier breached their duty of reasonable care by allowing Bernadel "to operate as a driver-partner, fail[ing] to 'deactivate' Defendant Bernadel as a driver-partner or deny access to his driver account[.]" *Id.* ¶¶ 52, 63. Mrs. McGlashan alleges "as a direct and proximate result" of Uber and Rasier's "negligent selection or retention of Defendant Bernadel, Decedent, MILES MCGLASHAN, suffered great bodily harm on November 9, 2022, *which caused his death*." *Id.* ¶¶ 54, 65 (emphasis added).

Those allegations make clear Bernadel's intentional shooting—not Uber or Rasier's allegedly negligent selection or retention of Bernadel—caused Decedent's injuries. Even when viewed from Uber and Rasier's perspective, their conduct—allowing Bernadel to drive for Uber, failing to deactivate or deny access to his Uber account—is not "a sudden, unexpected and

unintended event[,]" let alone an event "that causes **bodily injury** or **property damage**." ECF Nos. [1-1] at 2, [1-2] at 2. As discussed, the State Court Complaint does not allege Uber or Rasier's negligent conduct caused Decedent's bodily injury. Furthermore, McGlashan provides no support for her argument that the Incident constitutes an "accident" simply because it was unexpected from the perspectives of Uber and Rasier. An intentional shooting is not an unexpected or unintended event causing bodily injury regardless of which insured's perspective is used to view the Incident.

As such, the Court concludes that the undisputed evidence and allegations in the Wrongful Death Action demonstrate that the Incident does not constitute an "accident" under the Policies.

### iii. Whether the Intentional Act Exclusion Applies to the Incident

Progressive also argues it is entitled to judgment on Count III because the undisputed evidence shows the Incident was an intentional act triggering the Intentional Act Exclusion under the Policies. Progressive contends Florida courts have routinely found intentional shootings are properly excluded from coverage as intentional acts. Bernadel responds by reiterating his "affidavit" demonstrates whether he intentionally shot Decedent with sufficient intent constitutes a genuine dispute of material fact. McGlashan relies on *Tokio Marine* to argue that as with Count II, the Severability Clause makes clear the Intentional Act Exclusion does not apply because Uber and Rasier did not expect Berandel to shoot and kill Decedent.

The Intentional Act Exclusion provides:

Coverage under this Part I, including **our** duty to defend, does not apply to:

1. **Expected or Intended Injury**
   **Bodily injury** or **property damage** either expected by, or caused intentionally by, or at the direction of, the **insured**.

ECF Nos. [1-1] at 6, [1-2] at 7.

Progressive contends the Intentional Act Exclusion applies because Bernadel's testimony

demonstrates the Incident was caused intentionally by Bernadel. Progressive primarily relies on *Prudential Property & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467 (Fla. 1993) for support.

In *Swindall*, the Florida Supreme Court was asked to determine whether an intentional injury exclusion in a homeowner's insurance policy excludes coverage for intentional acts that accidentally cause bodily injury. 62 So. 2d at 468. The court concluded that it does not, explaining "if the finder of fact concludes that the gun was accidentally discharged, the intentional injury exclusion in [the homeowner's] policy does not exclude coverage because the insured would not have expected or intended bodily injury to result. However, should the jury find that [the homeowner] intentionally fired his gun at [the injured party] intending to injure him, the exclusion would apply." *Id.* at 473. In the process of reaching its conclusion, the court observed this holding was consistent with its prior decision in *State Farm Fire & Cas. Co. v. Marshall*, 554 So. 2d 504 (Fla. 1989), which "held that an intentional injury exclusion clause excluded coverage for an act of self-defense where the insured intended to harm the attacker." *Id.* at 472 (citing *Marshall*, 554 So. 22 at 505). The court observed "*Marshall* was consistent with a line of cases in which courts have precluded coverage where an insured intentionally strikes an intended victim, by, for example, aiming a firearm at that person and pulling the trigger intending to wound that person." *Id.* (citing *Clemmons v. American States Ins. Co.,* 412 So.2d 906 (Fla. 5th DCA), *review denied,* 419 So.2d 1196 (Fla. 1982) (footnote call number omitted)).

The Court agrees with Progressive that the Incident is excluded from coverage under the Intentional Act Exclusion. Bernadel's deposition testimony demonstrates the Incident is an intentional act: bodily injury (Decedent's death) caused intentionally by (Bernadel firing a gun at Decedent with the intent of hitting him) the insured (Bernadel). As Progressive correctly points out, that is the precise scenario envisioned in *Swindal* where an intentional act exclusion would

apply to absolve Progressive of its duty to defend Bernadel. Furthermore, Bernadel's "affidavit" fails to create a genuine dispute of material fact as to his intent for the reasons discussed above. Bernadel's remaining arguments have already been addressed and rejected in the context of his Motion for Judgment on the Pleadings.[7]

McGlashan again relies on *Tokio Marine* to argue the Incident is not excluded by the Intentional Act Exclusion because, from the perspective of Uber and Rasier, the Incident was unexpected. As discussed, however, *Tokio Marine* fails to support finding the Intentional Act Exclusion does *not* apply where, as here, Bernadel intentionally shot Decedent. The Incident thus constitutes an act causing bodily injury even if this intentionally act was unexpected from Uber and Rasier's perspective. Furthermore, this conclusion is consistent with the State Court Complaint's allegation that Bernadel intentionally shot Decedent. *See,* ECF No. [28-1] ¶ 36. Taking those allegations as true, the Court finds Progressive has demonstrated that the undisputed evidence shows the Incident is excluded from coverage under the Policies' Intentional Act Exclusion. Progressive is accordingly entitled to judgment on Count III.

In sum, Progressive has established the undisputed evidence shows the Incident does not implicate coverage under the Policies. The allegations in the Wrongful Death Action do not trigger Progressive's duty to defend or indemnify Defendants under the Policies. Progressive is accordingly entitled to summary judgment with respect to Counts I – III.

### IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Christopher Bernadel's Motion for Judgment on the Pleadings, **ECF No. [42]**, is **DENIED**.

---

[7] Bernadel again argues Progressive must defend him because the State Court Complaint contains negligence claims and that Progressive lacks standing. Those arguments are rejected for the same reasons.

2. Progressive's Motion for Partial Summary Judgment, **ECF No. [48]**, is **GRANTED**.

3. The Court **DECLARES** that:

    a. Neither the Period 1 Policy nor the Period 2-3 Policy provides bodily coverage to Defendants Rasier (FL), LLC, Uber Technologies, Inc., or Christopher Bernadel for the bodily injury or wrongful death claims associated with the death of decedent, Miles McGlashan, or that was, are, or could be presented by Defendant, April N. McGlashan, as Personal Representative of the Estate of Miles McGlashan, in connection with the November 9, 2022 incident, including those contained within the Second Amended Complaint;

    b. Progressive has no duty to defend Defendants Rasier (FL), LLC, Uber Technologies, Inc., or Christopher Bernadel in connection with the claims asserted in the action styled *April N. McGlashan, as personal representative of the Estate of Miles McGlashan, Plaintiff, v. Christopher Bernadel, et. al.*, Case No. CACE-23-003146, filed and pending in the Seventeenth Judicial Circuit in and for Broward County, Florida, as there exists no coverage under either the Period 1 Policy or the Period 2-3 Policy for such claims;

    c. Progressive has no duty to indemnify Defendants, Rasier (FL), LLC, Uber Technologies, Inc., or Christopher Bernadel for any damages being claimed by April N. McGlashan, as Personal Representative of the Estate of Miles McGlashan, Deceased, including those claimed in connection with the Second Amended Complaint;

    d. the events giving rise to the shooting of Miles McGlashan, do not arise from the "ownership, maintenance or use" of an insured auto as required under either

Case No. 23-cv-60654-BLOOM/Valle

the Period 1 Policy or the Period 2-3 Policy;

e.   the shooting of Miles McGlashan by Defendant Christopher Bernadel is not an "accident," as required under either the Period 1 Policy or the Period 2- 3 Policy; and

f.   the shooting of Miles McGlashan by Defendant Christopher Bernadel was expected by or caused intentionally by or at the direction of Christopher Bernadel, such that coverage is excluded by operation of the Intentional Act Exclusion under both the Period 1 Policy and the Period 2-3 Policy.

4.   The Court will issue its final judgment in a separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 8, 2024.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record